## SILER v. BARBER et al.
### -No. 1981.

Court of Civil Appeals of Texas. Beaumont.
June 6, 1930.

Rehearing Denied July 2, 1930.

A. M. Huffman, of Beaumont, for appellant.

Orgain, Carroll & Bell, of Beaumont, for appellees.

### WALKER, J.

Appellant and appellee R. S. Barber formed a partnership for the purpose of wrecking certain old ships anchored in the Neches River. After this work was done they continued their partnership for the purpose of manufacturing crates. Appellant brought this suit against R. S. Barber for an accounting. It was his contention that appellee had charge of the books of the partnership and received and paid out the funds of the partnership, had charge of the assets of the partnership, and that at the winding up of the partnership business appellee was due him from the partnership assets in excess of $5,000. It was the contention of appellee that the partnership assets were insufficient to pay the partnership debts, and that appellant was due him a balance. The trial was to the court without a

jury, with judgment for appellee against appellant for $80.76, from which appellant has duly prosecuted his appeal. Conclusions of law and fact were filed in support of the judgment.

On motion of appellant, appellee filed, prior to announcement of ready for trial, a detailed account of the partnership business, to which appellant duly excepted, and much testimony was received in support of his exceptions. However, assignments are urged only against the findings of the court on the following issues: First: Appellant charged that appellee had appropriated to his use certain saws belonging to the partnership of the value of $32.13, one belt of the value of $75, and a second belt of the value of $79.32. The account, in fact, showed credit for the $79.32 belt. We think appellant showed that appellee appropriated, with or without his consent, the saws of the value of $32.13 and the belt of the value of $75. In filing his account appellee listed many invoices without explaining in detail what they were for, for instance, invoice No. 2, $16.32; invoice No. 10, $860.00; invoice No. 11, $64.82. No invoices corresponded with the value of the saws in the sum of $32.13 nor of the value of the belt in the sum of $75. But there was no testimony that these items were not in fact included in some of the invoices. Appellee testified that the account as filed was correct. On this statement the trial court concluded as follows:

"I further find that W. S. Siler has failed to prove that R. S. Barber and Barber Lumber & Mfg. Co. did not give the partnership credit for the sum of $32.13 for a saw and material claimed to have been appropriated to the use of R. S. Barber and Barber Lumber & Mfg. Co.; that various items of credit appear upon the account above approved and W. S. Siler has not shown that such credits do not cover and include the value of the saws to have been appropriated to the use of R. S. Barber and Barber Lumber & Mfg. Co."

We think the trial court gave the correct weight and construction to the testimony on these issues by refusing to find that the value of these items was not included in the account filed. Second: Appellant contends that the court erred in charging against the partnership the item of $1,200 as salary for R. S. Barber and the item of $600 as the reasonable rental value of certain premises owned by Barber, but used by the partnership for storage purposes. Appellant testified that R. S. Barber was to give his services to the partnership free of charge, and was to furnish premises for storage purposes free of charge. He testified further that he continued managing the partnership as per the partnership agreement until it ceased business, and its affairs were practically wound up. On these issues Barber testified as follows:

"As to the agreement with reference to my services to the partnership and any compensation therefor, I will say in the beginning it was the understanding that Mr. Siler was to attend to the dismantling of the ships and sell the lumber, and give it his whole attention, on a salary. I wasn't supposed to have anything to do or bother about it. It looked like a small affair when we started in, but it lasted a good long time and it wound up by me having to go up and ship out the timber and keep the thieves from taking it off. I had to make several trips off in selling goods and doing collections, along towards the last; I don't remember how many, but that is the truth; I made the trips away out in West Texas trying to make collections on bad accounts that Mr. Siler had made. It really took a great deal of my time doing it, and took me away from my business. I do not have any way of stating approximately the percentage of my time that the partnership of Barber & Siler required. It was necessary, after Mr. Siler left, for me to look after the affairs of the partnership or let it go to the bad. Just like the case of those timbers up there, I heard they were stealing them, and they had been up there long enough for the weeds to grow up that high on top of them (indicating) and they had got to taking them down the river. About collecting these bills that we had sold long prior, I thought it was best to go and collect them, and I did it the best I could; finally wound it up, make compromises and one thing and another. With reference to the purchase of things for the partnership, nails and equipment, and machinery, it was not necessary for me to give any of my time: I didn't give that much time, to my sorrow; there was a great deal of surplus stuff bought that we had to junk off around here, sell off the best we could.

"There is no charge made on the account for bookkeeping services or such as that of our book keeper. In explanation of the charge of $600 for storage, I will say this: When the question of making crates came up, I didn't know a thing in the world about it. Mr. Siler represented to me it was a very money-making thing, and if we would go into that we could make some money. He told me how we could do it; we could go to the saw mill and use the scrap, the sap, and the edges and broken and short pieces, and make that into crates. We started out on that theory; we would use the waste at the sawmill. Well, he made a trip down in the Valley County to see how things looked, and when he came back he reported that they were no longer taking, except at very reduced prices, pine crates such as we were making. We had already made our arrangements and got our equipment and started to making them, and invested so heavily in things like nails and other things—he had bought over a thousand dollars worth of different machinery—that

we thought we had better go on anyway. We had to go out and buy hard wood lumber to make crates, and a great deal of veneer, amounting to something like a thousand dollars worth of veneer. We went on to carry out what we started to do, to make some crates, notwithstanding all these adverse circumstances had come up that we were not expecting. We made a big lot of crates, possibly between forty and fifty thousand crates, and then, the next thing was selling them. Mr. Siler got on the train and went out to sell them, and couldn't get anything hardly for them, made trips around and finally sold them down at a ridiculously low price, way below what it cost to make them. That is, he finally closed out the last lot that way. In talking about the crate business, in starting up, I brought up the question of how much room was it going to take. I didn't want to sacrifice my business to make some crates, because that wasn't my line of business. He said it wouldn't take but a little space; that we could do this and keep out of the way. After we started, it turned out different. It took up about all the space I had around there. The complete planing mill was filled with this that and the other, and worked from about 12 to 20 people in there, in the planing mill, making those crates, putting them together. That is, the partnership of Barber & Siler had a bunch of men at work in the planer department. I should guess the planer building is about 80 feet by 80 feet. During the time that this stuff was stored there I was not at all times able to conduct my planer and operate it; we just had to get out of the way; there was no room, because sorting out of all that thing, and the material and the working space for these 20 people took up so much room.

"I did not agree that we would not charge any storage. That never come up. If he had not interfered with my business I didn't intend to charge him. Later on I saw we could not do anything, I thought I was entitled to something for the space. If he could have found a store room, like he thought he could, where it wouldn't interfere, I didn't intend to charge, but he didn't do it, and it was right to charge after I found out what space was taken.

"I never made any agreement with him not to charge any salary, because I did not know he was going to put on me at the last. If he had gone on and attended to it, and taken none of my time, it would have been a different affair. Mr. Siler did not put any money into the business. The $500 he paid me did not go into the business. He drew down a salary of $200 a month for part of the time and $125 per month the early part of the business, making a total of over $2,000 he got out of it. As to how much I made out of the

partnership, I will say I just went busted on it."

██ We think this testimony by R. S. Barber raised the issue that Siler abandoned the partnership before it affairs were wound up, and that R. S. Barber was forced to render services to the partnership not contemplated by the partnership agreement, of the reasonable value of $1,200. We also think his testimony fully sustains the trial court's conclusions on the issue of storage.

It follows that the judgment of the lower court should be affirmed, and it is accordingly so ordered.